IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JEFF COUTO; HEIDI COUTO; and COUTO & SONS PROPERTY SERVICE, LLC, for themselves and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CORVEL ENTERPRISES COMP., INC.; ALACRITY ADJUSTING SOLUTIONS, LLC; ALACRITY CLAIMS SOLUTIONS, LLC; MITCHELL INTERNATIONAL, INC.; and DOES 1-10,<br><br>Defendants. | CV 24-144-M-DWM<br><br><br>OPINION<br>and ORDER |

In September 2023, a Sysco semi-truck hit Jeff and Heidi Couto's street-parked Suburban. In October 2024, Plaintiffs Jeff Couto, Heidi Couto, and Couto & Sons Property Service, LLC (together, "Plaintiffs") sued, alleging their claimed loss was undervalued. Sysco was self-insured and used CorVel Enterprise Comp., Inc. ("CorVel")[1] as a third-party claim administrator, which in turn contracted with insurance adjuster, Alacrity Adjusting Solutions, LLC and Alacrity Claims Solutions, LLC (together, "Alacrity") that relied on software designed and sold by

---

[1] CorVel is erroneously named "CorVel Corporation" in the Complaint. (*See* Doc. 1.) The caption is amended as reflected above.

Mitchell International, Inc. ("Mitchell") in its valuation. There are two motions pending. Mitchell seeks dismissal for lack of personal and subject matter jurisdiction, and dismissal of specific claims for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 16.) CorVel seeks dismissal of each claim based on statutory preclusion and dismissal of specific claims under Rule 12(b)(6). (Doc. 18.) Both defendants also raise standing arguments. The motions are granted in part and denied in part.

## BACKGROUND

The allegations in Plaintiffs' Complaint, (*see* Doc. 1), are assumed to be true and construed in their favor. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021).[2]

### I.    The Accident

Jeff and Heidi Couto are husband and wife (the "Coutos") and the sole owners of Couto & Sons Property Service, LLC ("Couto LLC"), a Montana lawncare and landscaping business. (Doc. 1 at ¶ 5.) Couto LLC holds title to the couple's 2001 Chevrolet Suburban. (*Id.* ¶¶ 1, 4.) On September 23, 2023, their Suburban was struck by a Sysco delivery truck. (*Id.* ¶¶ 12–15.) The driver of the Sysco truck admitted full responsibility for the collision, giving the Coutos his

---

[2] Submissions beyond the pleadings were not considered in resolving the Rule 12(b)(6) motion. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

liability coverage and manager's contact information.  (*Id.* ¶ 15.) The Suburban

was "badly damaged," but drivable, and the Coutos drove it home.  (*Id.* ¶ 16.)

Some days after the crash, Heidi Couto spoke with Samantha Bryant, a liability

claims specialist with CorVel, who reviewed the dash camera footage and driver's

report and determined that liability was "clear cut."  (*Id.* ¶ 17.)

## II.  The Valuation

As indicated above, the relationship between the various defendants in this

action is complicated.  CorVel is a third-party claim administrator that handles

automobile liability claims on behalf of its customers, which include self-insured

companies like Sysco.  (*Id.* ¶¶ 1, 16; Doc. 19 at 9.)  In turn, CorVel engaged

Alacrity, an insurance adjuster, to adjust the Coutos' claim.  (Doc. 1 at ¶¶ 1, 21.)

In doing so, Alacrity used two valuation software products designed and sold by

Mitchell: WorkCenter Total Loss ("Valuation Software") and Mitchell Estimating

23.3 ("Estimate Software") (together, "Mitchell Software" or "Software").  (Doc.

at ¶¶ 1, 22; Doc. 17 at 11.)

The Coutos obtained a repair cost estimate of $9,157.24 the Suburban.  (*Id.*

¶ 18.)  They also searched the market for vehicles comparable to the Suburban,

which were generally priced around $10,000.  (*Id.* ¶ 19.)  CorVel/Sysco sent the

Coutos a check for $3,943.48.  (*Id.* ¶ 20.)  This amount was calculated as the

"actual cash value" of the vehicle ($4,570.64) less the salvage value ($679.14) plus

"out of pocket rental expense" ($69.98). (Doc. 1-5 at 7.) In an email to the Coutos' counsel, Bryant explained this figure by stating, "[w]e do not owe to replace their vehicle, we owe the actual cost of the vehicle." (*Id.*) The "actual cash value" was calculated using the Mitchell Software. (*Id.* at ¶ 21.)

The Valuation Software provides a methodology for estimating the value of vehicles and generates a report. (*Id.* ¶¶ 22, 25; Doc. 1-5 at 7.) This methodology consists of the following five steps: (1) locate comparable vehicles, (2) adjust comparable vehicles, (3) calculate base vehicle value, (4) calculate loss vehicle adjustments, and (5) calculate the market value. (Doc. 1-5 at 7.) At the first step, in this case, three comparable for-sale vehicles were identified—two in Montana and one in Idaho. (Doc. 1 at ¶ 22; Doc. 1-5 at 3.) At the second step, the value adjustment gave the Coutos credit for the mileage difference at a rate of roughly one cent ($0.01) per mile. (Doc. 1 at ¶ 22.) Standard automobile reference sources state that the appropriate adjustment for vehicles after three years range from five ($0.05) to twenty-five cents ($0.25) per mile. (*Id.*) The Valuation Software's undervaluation of the mileage depreciation of the selected comparable vehicles resulted in CorVel undervaluing the payment to the Coutos by thousands of dollars. (*Id.*) According to Plaintiffs, such undervaluation of the mileage depreciation through the Valuation Software "is systemic and programmatic across

America" and has resulted in underpaying thousands of American consumers by many millions of dollars. (*Id.* ¶ 23.)

At the second step, the Valuation Software also included a Projected Sold Adjustment, which reduced the value of two of the comparable vehicles based on an assumption that the owner of the damaged vehicle could "haggle" with the car salesman to get below the list price. (*Id.* ¶ 24; *see* Doc. 1-5 at 5.)  In recent years, the Projected Sold Adjustment has been the subject of several certified class action lawsuits in multiple states. (Doc. 1 at ¶ 24 n.3 (citing *Schroeder v. Progressive Paloverde Ins. Co.*, 713 F. Supp. 3d 523 (S.D. Ind. 2014); *Richardson v. Progressive Am. Ins. Co.*, 2022 WL 154426 (M.D. Fla. Jan. 18, 2022); *Volino v. Progressive Casualty Ins. Co.*, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023)).)[3] According to expert testimony in these cases, the Valuation Software manipulates the data used to calculate the Projected Sold Adjustment by excluding from the dataset every transaction in which a used vehicle sold for above the list price and, prior to July 2021, every transaction in which the sale price of a used vehicle was equal to its list price. (*Id.* ¶ 24.)  Essentially, this expert testimony found that the

---

[3] Mitchell was not a defendant in *Schroeder* or *Volino*, and the claims against Mitchell in *Richardson* are distinct from those alleged here.  For example, in *Richardson*, plaintiffs allege that Mitchell "wrongfully interfered with [their insurer's] contractual obligations to Plaintiffs by knowingly and intentionally selling to [the insurer] a statistically invalid and wholly arbitrary total loss valuation product for the specific purpose of enabling [the insurer] to underpay the claims of total loss insureds, including Plaintiffs."  2022 WL 154426, at *4.

software "deliberately and deceptively discards all data that does not support a reduction in sale price." (*Id.*)

Alacrity also used the Estimate Software to estimate the cost of repairing the Coutos' Suburban. (*Id.* ¶ 25.) The Estimate Software determined that the cost of repair as to the Coutos' Suburban would be $3,419.59. (*Id.*) Although Alacrity employee Steve Workman entered the underlying data into the software, he said that the estimated repair amount was over $1,500 low in his opinion. (*Id.*) According to Workman, "the whole driver side [of the Couto's Suburban] is destroyed" and that the repair estimate product is "almost always going to be low." (*Id.*) According to Plaintiffs, the practice of underestimating repair cost through the Mitchell Software "is systemic and programmatic across America" and has resulted in underpaying thousands of consumers by millions of dollars. (*Id.* ¶ 26.)

The results of the Valuation Software and Estimate Software were presented as a report for Alacrity. (*Id.* ¶ 22.) Alacrity, in turn, used these results to prepare its own report for CorVel. (*Id.* ¶¶ 21, 22, 24, 25.)

Because CorVel refused to pay for the Coutos' Suburban to be repaired or replaced at actual cost, the Coutos continued to drive the damaged vehicle, requiring them to cancel a family road trip and raising safety concerns. (*Id.* ¶¶ 27, 28.) The Coutos were further distressed that their Suburban was damaged because it had sentimental value, (*id.*), and the vehicle in that condition was embarrassing,

6

(*id.*).  According to Bryant, there is no coverage for inconvenience, but instead compensation for loss of business only upon receipt of documentation proving actual loss, and compensation for loss during the time the vehicle would be in the body shop.  (*Id.* ¶ 29.)  She also refused to produce the video of the collision, or any statements she collected in her internal investigation, asserting work product protections.  (*Id.* ¶ 30.)  Bryant then agreed to pay the Coutos an additional $3,000 but only in return for their signing of a boilerplate release that included a warning of penalties for fraud and release language as to claim handling and property damage.  (*Id.* ¶ 31.)  CorVel refused to accept a revised release.  (*Id.*)

## III.   Procedural Background

On October 16, 2024, Plaintiffs brought suit against CorVel, Alacrity, and Mitchell, alleging common-law bad faith (Count I), a violation of the Consumer Protection Act (Count II), "agent liability" (Count III), negligence (Count IV), negligence per se (Count V), and joint tortious enterprise (Count VI).  (Doc. 1.)  Plaintiffs also seek class certification with the proposed class pursuing declaratory judgment (Class Count I), injunctive relief (Class Count II), negligence (Class Count III), common-law bad faith (Class Count IV), a violation of the Consumer Protection Act (Class Count V), unjust enrichment (Class Count VI), and joint tortious enterprise (Count VII) (together, "Class Claims").  (*Id.*)

On December 10, 2024, Mitchell moved to dismiss the Complaint for lack of standing, personal jurisdiction, and subject matter jurisdiction, as well as failure to state a claim upon which relief can be granted. (Doc. 16.) On December 12, 2024, CorVel moved to dismiss based on lack of standing, statutory preclusion, and failure to state a claim. (Doc. 18.) The next day, Alacrity answered. (Doc. 21.)

ANALYSIS

Mitchell and CorVel's motions to dismiss are granted in part and denied in part. As to the threshold issues,[4] Plaintiff Heidi Couto lacks standing and this Court lacks personal jurisdiction over Mitchell. As to the merits, while Plaintiffs' tort claims are not precluded by the Montana Unfair Trade Practices Act ("UTPA"), their consumer protection claim fails to state a claim upon which relief can be granted and agent liability is not a standalone claim. Plaintiffs' common-law bad faith claim is construed as a common-law bad faith clam and a claim for violations of § 33-18-201 of the UTPA. The former claim fails as a matter of the

---

[4] CorVel also argues that Plaintiffs have engaged in "improper claim splitting" by making "duplicative claims for the same alleged damages" as they seek in an underlying action against Sysco in state court. (Doc. 19 at 27 (internal quotation marks omitted).) This argument fails as a matter of law because "[c]laim splitting applies only to duplicative cases involving concurrent jurisdiction within federal court, and does not apply [to a] case[] involving concurrent jurisdiction between state and federal court." *Travelers Indemnity Co. of Conn. v. Newlin*, 498 F.Supp.3d 1262, 1280 (S.D. Cal. 2020) (footnote omitted) (citing *Noel v. Hall*, 341 F.3d 1148, 1159 (9th Cir. 2003) ("[O]verlapping or even identical federal and state court litigation may proceed simultaneously, limited only by doctrines of abstention and comity[.]")).

law, but the latter may proceed.  Lastly, evaluation of Plaintiffs' class claims is not appropriate at this stage.

### I.   Standing

"[S]tanding is a threshold jurisdictional requirement[,]" *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 834 (9th Cir. 2023), that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The doctrine of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The constitutional dimension, Article III standing, derives from the Constitution's case-or-controversy requirement, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), while prudential standing is "judicial self-government" that limits the exercise of federal jurisdiction, *Lujan*, 504 U.S. at 560.[5]  "The party invoking federal jurisdiction bears the burden of establishing" standing.  *See Lujan*, 504 U.S. at 560.  "While constitutional standing is evaluated under Rule 12(b)(1), prudential standing is evaluated under Rule 12(b)(6)." *Elizabeth Retail Props. LLC v.*

---

[5] The Supreme Court has expressed doubt about whether the two concepts are truly distinct insofar as many prudential concerns also implicate Article III standing. *See Lexmark Int'l, Inc.*, 572 U.S. at 127 n.3.

*KeyBank Nat'l Ass'n*, 83 F. Supp. 3d 972, 986 (D. Or. 2015) (citation omitted); *see Arakaki v. Lingle*, 477 F.3d 1048, 1056 (9th Cir. 2007).

Here, Mitchell and CorVel argue that the Coutos lack standing because their damaged vehicle was registered to Couto LLC and, as a result, the Coutos lack "any legal right or interest in the vehicle." (Doc. 17 at 21; *see* Doc. 19 at 14–16.) This argument, while not identified as such, is one of prudential standing, more specifically, the "shareholder standing rule." This rule "is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation." *Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); *see also Elizabeth Retail*, 83 F. Supp. 3d at 986 (explaining the shareholder standing rule applies to members of LLCs). Under the shareholder standing rule, Heidi Couto lacks standing.

Although "standing in federal courts is a question of federal law, not state law[,]" *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013), Montana law establishes the parameters of Couto LLC's property ownership because it is a limited liability company formed under the laws of Montana, *e.g.*, *Barker v. Gottlieb*, 23 F.Supp.3d 1152, 1163 (D. Haw. 2014); *In re Kuiken*, 484 B.R. 766, 769 (B.A.P. 9th Cir. 2013); (*see* Doc. 1 at ¶ 5). Under Montana law, "[a] member has no interest in specific limited liability company property." Mont. Code Ann. § 35-8-701. This statute does not differentiate between sole-owner members and other members.

10

*See generally id.*  Accordingly, akin to a shareholder of a corporation, the Coutos'
alleged injury cannot derive solely from their ownership of Couto LLC.  *See Shell
Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983); *Elizabeth Retail*, 83
F.Supp.3d at 986.  Instead, the Coutos "must be injured directly and independently
of" Couto LLC.  *Shell Petroleum, N.V.*, 709 F.2d at 595.  Such a direct and
independent injury can be shown if an LLC member "suffers injury separate and
distinct from that suffered by other" LLC members, or if a member asserts a
"special duty, such as a contractual duty, between the wrongdoer and the" LLC
member.  *Sax v. World Wide Press, Inc.*, 809 F.2d 610, 614 (9th Cir. 1987).

Here, Plaintiffs concede that the Suburban is owned by Couto LLC, but
assert that the car is used "as their primary family vehicle." (Doc. 1 at ¶ 5.)  Couto
LLC is also both closely held and family-owned, as the Coutos are the sole owners
and members of Couto LLC. (*See id.*)  While the Coutos have no legal interest in
the Suburban as it is specific Couto LLC property, *see* Mont. Code. Ann. § 35-8-
701, the reports generated by Mitchell and Alacrity refer to "Jeff Couto" as the
"Claimant" with no reference to Couto LLC. (Doc. 1-5 at 1; Doc. 1-6 at 1.)  The
wrongdoing alleged here stems from the unfair valuation methodology utilized by
the Mitchell Software, which was used by both Alacrity and CorVel to undervalue
the insurance claim payout.  Jeff Couto is the claimant on this very claim, giving
rise to a special duty between defendants and Jeff Couto.  *See Sax*, 809 F.2d at 614.

11

Accordingly, he has standing. Heidi Couto, on the other hand, does not allege, nor do the pleadings show, that she, as an individual, has any sort of special relationship with defendants. While she alleges both economic and non-economic injuries, including emotional distress, those allegations extend to all members of the LLC. (*See* Doc. 1 at 29 (seeking "[n]on-economic damages, including for emotional distress and lost enjoyment of life").) Heidi Couto lacks standing.

## II.    Personal Jurisdiction

Personal jurisdiction may be challenged under Rule 12(b)(2) of the Federal Rules of Civil Procedure. "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* (internal quotation marks omitted). Although the plaintiff "cannot simply rest on the bare allegations of its complaint," uncontroverted allegations must be taken as true. *Id.* (internal quotation marks omitted). In other words, courts do not assume the truth of allegations in a pleading that are contradicted by affidavit. *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022). However, "conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor."

12

*Id.* (internal quotation marks and alteration omitted).  Consistent with the standards applicable to Rule 12(b)(2) motions, the facts are taken from Plaintiffs' Complaint, (*see* Doc. 1), a submitted declaration, (Doc. 17-1), and other relevant jurisdictional evidence submitted by the parties, *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  In Montana, courts apply a two-step test to determine whether they have personal jurisdiction over a nonresident defendant. *Milky Whey, Inc. v. Dairy Partners, LLC*, 342 P.3d 13, 17 (Mont. 2015).  First, courts consider whether personal jurisdiction exists under Montana's long-arm statute, Rule 4(b)(1) of the Montana Rules of Civil Procedure. Rule 4(b)(1) subjects parties to general jurisdiction if they are "found within the state of Montana" and to specific jurisdiction "as to any claim for relief arising from the doing personally, or through an employee or agent, of" certain enumerated acts.  Mont. R. Civ. Pro. 4(b)(1)(A), (B).  Second, courts consider whether the exercise of personal jurisdiction comports with due process. *Milky Whey*, 342 P.3d at 17.  Due process "depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional

13

notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). "The defendant . . . must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* at 359 (internal quotation marks and alterations omitted). "Accordingly, exercising specific personal jurisdiction over a defendant is only appropriate when both the defendant and the underlying controversy are appropriately affiliated with Montana." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 443 P.3d 407, 412 (Mont. 2019).

Here, Plaintiffs do not dispute that there is no general personal jurisdiction over Mitchell but argue that Mitchell has sufficient minimal contacts with Montana to support a finding of specific personal jurisdiction. Ultimately, even assuming that Mitchell is subject to personal jurisdiction under Rule 4(b)(1), such exercise is inconsistent with due process. Accordingly, Mitchell is dismissed from this action.

### a. Due Process

Mitchell argues that the exercise of personal jurisdiction here is inconsistent with the Due Process Clause. Plaintiffs disagree. Because "a federal district court is constrained by the Fourteenth Amendment[,]" there are

> three requirements for establishing specific jurisdiction over a non-resident defendant: [i] the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; [ii] the claim must be

one which arises out of or relates to the defendant's forum-related activities; and [iii] the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023) (internal quotation marks omitted).  If a plaintiff establishes the first two elements, the burden "shifts to the defendant" as to the third element requiring a presentation of  "a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* at 1099 (internal citation omitted).  Because Plaintiffs fail to show that the first element of due process (purposeful direction) is met, exercising personal jurisdiction over Mitchell does not comport with due process.

    "[P]urposeful direction is often the better approach for analyzing claims in tort."  *Id.* at 1088 (internal quotation marks omitted).  Application of this test "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.  All three parts of the test must be satisfied." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  This is known as the "*Calder* effects test." *Id.*  The Supreme Court has expressly held that the Due Process Clause permits the exercise of personal jurisdiction over a defendant who "purposefully direct[s]" activities at residents of a forum, even in the "absence of physical contacts" with that forum. *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985).

Here, Plaintiffs argue that Mitchell committed the intentional act of designing its Valuation Software, which was expressly aimed at Montana because it was designed to be used in Montana. Such design allows the Software to find vehicles for sale in Montana, obtain Montana public information, and adjust to taxes and fees based on Montana rules and regulations. Because Mitchell was aware that its Software would be used in Montana, it knew harm was likely to be suffered there as well. Mitchell disagrees, and, ultimately, is correct.

"'Intentional act' has a specialized meaning in the context of the *Calder* effects test." *Schwarzenegger*, 374 F.3d at 806. The term "act" "denote[s] an external manifestation of the actor's will . . . not includ[ing] any of its results, even the most direct, immediate, and intended." *Id.* (quoting Restatement (Second) of Torts § 2). "Intent" here "refer[s] to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Id.* Here, the intentional act was Mitchell's design and sale of the Software.

The next question then is whether that "intentional act" was "expressly aimed at" Montana. *Dole Food Co.*, 303 F.3d at 1111. The Mitchell Software is designed to collect and analyze regional and local data. However, Plaintiffs did not allege that the Software is designed with a Montana-specific focus.[6] In other

---

[6] As explained above, Plaintiffs allege that the Software was "designed . . . to be used in Montana." (Doc. 35 at 22.)

words, just because the Software is compatible with various local markets does not mean that it is aimed at a specific local market, particularly when Mitchell does not "exploit" a customer base there for "commercial gain." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011).  Indeed, a plaintiff cannot establish specific personal jurisdiction through nonspecific contacts with the forum state. *See Walden*, 571 U.S. at 290.  Though not directly on point, in its recent *en banc* decision, *Briskin v. Shopify, Inc.*, the Ninth Circuit held that "an interactive platform 'expressly aims' its wrongful conduct toward a forum state when its contacts are its own choice and not random, isolated, or fortuitous, even if that platform cultivates a nationwide audience for commercial gain."  135 F.4th 739, 758 (9th Cir. 2025) (internal citations and quotation marks omitted).[7]  The facts here are distinguishable from those in *Briskin* for many reasons, the three most significant being that the Mitchell Software is not an interactive platform, the tortious conduct here is not premised on the collection of consumer personal information, and Mitchell does not "conduct[] its regular business in [Montana], contact[] [Montana] residents, interact[] with them as an intermediary for its merchants, install[] its software onto their devices in [Montana], [or] track their activities." *Id.*

---

[7] The issuance of this decision moots Plaintiffs' request for a stay.

Here, Mitchell's contacts with Montana are "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 475 (internal quotation marks omitted); *see Briskin*, 135 F.4th at 759. For example, the Valuation Software identified comparable vehicles based on a mile radius, pulling comparisons from not only Montana, but Idaho as well. (Doc. 1-5 at 3–6.) This indicates that while the Software included Montana, it employs a "Search Radius" that is indifferent to state borders. (*See id.*) Further, this data is gathered from publicly available websites, such as cars.com and autotrader.com. (Doc. 35-4 at 2.) Thus, it is not pled, nor do the allegations show, that the Mitchell Software's collection of data "continuously and deliberately exploit[s] the [Montana] market." *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984).

Plaintiffs also assert that the following features of the Valuation Software's design demonstrate express aim at Montana: identification of state taxes and fees associated with the loss, receipt of lien and ownership information, and adaptation to the rules and regulations of the settlement process. These three features do not appear to be utilized in the report generated by the Valuation Software. (Doc. 1-5.)[8] Together, this report and the pleadings do not demonstrate that any of these features were used in the valuation of Plaintiffs' claim.

_____

[8] The "Vehicle Valuation Methodology Explanation," included at the end of the report, details the five steps of the Software methodology, which are explained above. (Doc. 1-5 at 7.) These steps do not include these three features. (*Id.*)

Even if these features were utilized, they would be an "attenuated contact[,]" *Burger King*, 471 U.S. at 475 (internal quotation marks omitted), at best. The first two functions—tax and fee identification and receipt of lien or ownership information—are "third-party integrations." (Doc. 35-4 at 3, 5.) For example, the integration for lien and ownership information "[c]onnect[s] customers with lenders to reduce loan payoff to settlement cycle time and receive loan payoffs, letters of guarantee, ownership verification, lien release letters, and copies of the title." (Doc. 35-4 at 5.) These features utilizing third parties, if they are even located in Montana, would be an attenuated contact with the state. The third feature—adaptation to the rules and regulations of the settlement process—is described by Plaintiffs as meaning that the Valuation Software "has a setting to address any specific Montana rules and regulations governing valuation." (Doc. 35 at 13–14.) But this again is merely an "attenuated contact." *Burger King*, 471 U.S. at 475 (internal quotation marks omitted).

Plaintiffs also argue that Mitchell's "First Script" program, which is marketed as a pharmacy benefit management for workers' compensation and auto casualty industries and includes the ability to locate pharmacies in Montana, demonstrates purposeful direction. (Doc. 35 at 24.) However, personal jurisdiction depends on the "relationship among the defendant, the forum, and *the litigation*." *Ford Motor Co.*, 443 P.3d at 412 (emphasis added) (quoting *Daimler*,

571 U.S. at 133). Mitchell's other business activities, which are unrelated to the events that gave rise to this case, do not bear on this relationship.

Lastly, Plaintiffs assert Mitchell "likely" engages in business with auto repair shops in Montana. (Doc. 35 at 23.) Indeed, they argue because "Mitchell boasts that it has a network of over '20,000' collision repair centers . . . it is virtually certain that many Montana body shops are within Mitchell's network." (*Id.*) However, Philip Kroell, a Senior Compliance Specialist at Mitchell, in his declaration, states that "Mitchell does not . . . solicit business in Montana." (Doc. 17-1 at ¶ 6.) This is relevant jurisdictional evidence, *Caruth*, 59 F.3d at 128, and Plaintiffs have not offered any evidence in contradiction.

Ultimately, Plaintiffs do not make a prima facie showing, *Schwarzenegger*, 374 F.3d at 800, that the design and sale of the Mitchell Software was expressly aimed at Montana. Because the exercise of jurisdiction would not comport with due process, Mitchell is dismissed for lack of personal jurisdiction; its additional arguments for dismissal are not considered.

## III.    Montana Unfair Trade Practices Act (UTPA)

CorVel argues that Plaintiffs' tort claims are precluded by § 33-18-242 of the Montana Unfair Trade Practices Act ("UTPA" or the "Act"). The UTPA "regulate[s] trade practices in the business of insurance . . . by defining or providing for determination of all such practices in this state which constitute

20

unfair methods of competition or unfair or deceptive acts or practices and by

prohibiting the trade practices so defined or determined." Mont. Code. Ann. § 33-

18-101. The Act states, in relevant part,

> A person may not, with such frequency as to indicate a general business
> practice, do any of the following:
>
> (1) misrepresent pertinent facts or insurance policy provisions relating
> to coverages at issue;
> . . .
> (4) refuse to pay claims without conducting a reasonable investigation
> based upon all available information;
> (5) fail to affirm or deny coverage of claims within a reasonable time
> after proof of loss statements have been completed;
> (6) neglect to attempt in good faith to effectuate prompt, fair, and
> equitable settlements of claims in which liability has become
> reasonably clear;
> . . .
> (9) attempt to settle claims on the basis of an application that was
> altered without notice to or knowledge or consent of the insured; [or]
> . . .
> (13) fail to promptly settle claims, if liability has become reasonably
> clear, under one portion of the insurance policy coverage in order to
> influence settlements under other portions of the insurance policy
> coverage
> . . .

Mont. Code Ann. § 33-18-201.

The UTPA provides an independent cause of action for "[a]n insured or

third-party claimant" against "an insurer for actual damages caused by the insurer's

[fraud or] violation of," certain general business practices enumerated in § 33-18-

201. Mont. Code Ann. § 33-18-242(1). This section was amended in 2023 to

include the following language:

> A third-party claimant who has suffered damages as a result of the
> handling of an insurance claim may bring an action against the insurer
> for fraud or pursuant to this section, but not under any other theory or
> cause of action. A third-party claimant may not bring an action for bad
> faith in connection with the handling of an insurance claim.

Mont. Code Ann. § 33-18-242(4). This language became effective on May 4,

2023. Under this provision, "the term 'insurer' does not include a person, firm, or

corporation utilizing a captive insurance company to pay claims made against it,

unless that captive insurance group is a captive risk retention group." Mont. Code

Ann. § 33-18-242(9). Notably, this section creates a cause of an action against an

"insurer" (as opposed to a non-insurer).

There are three different possible types of claims at issue here: claims under

§ 33-18-201, which prohibits "a person" from engaging in certain "general

business practices," and is enforceable through an implied private right of action[9];

claims under § 33-18-242, which provides "an independent cause of action against

an insurer for actual damages caused by insurer's violation of" certain business

practices enumerated in § 33-18-201; and common-law tort claims.

The underlying question presented here is whether Plaintiffs have brought

UTPA claims at all, and, if so, whether they have brought claims under § 33-18-

---

[9] In *Larson v. State by and Through Stapleton*, the Montana Supreme Court
explained that claims under § 33-18-201 are not common-law claims but are
instead "properly characterized as a private right of action implicitly conferred by"
§ 33-18-201. 434 P.3d 241, 255 n.13 (Mont. 2019).

201 or § 33-18-242. Indeed, Plaintiffs argue that they have only brought common-law tort claims, making the preclusive effect of the UTPA irrelevant. In their Complaint, Plaintiffs assert claims for common-law bad faith (Count I), negligence (Count IV), negligence per se (Count V), and joint tortious enterprise (Count VI) (together, "tort claims"). (Doc. 1.) They do not expressly assert UTPA claims. However, their common-law bad faith and negligence per se claims explicitly reference defendants' violations of § 33-18-201. (*Id.*) CorVel asserts Plaintiffs have brought UTPA claims under the guise of common-law action and, accordingly, Plaintiffs' claims are barred by statute. While CorVel is wrong regarding preclusion, for reasons discussed below, Plaintiffs' bad faith claim may only proceed as explained, and their consumer protection and agent liability claims independently fail.

CorVel argues that because Plaintiffs are third-party claimants seeking relief caused by an insurer's handling of a claim, § 33-18-242(4) precludes their tort claims. In response, Plaintiffs argue that because Sysco is not an insurer within the meaning of § 33-18-242, its preclusive effect is not triggered. Alternatively, Plaintiffs argue that the UTPA permits third parties to both sue insurers under § 33-18-242 and other persons for violations of certain business practices provided in § 33-18-201. Plaintiffs' alternative argument is persuasive.

Subsection (4) to § 33-18-242, which was added by the 2023 amendment, states, "[a] third-party claimant who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for fraud or pursuant to this section, but not under any other theory or cause of action. A third-party claimant may not bring an action for bad faith in connection with the handling of an insurance claim." Subsection (9) further states that an "'insurer' does not include a person, firm, or corporation utilizing a captive insurance company to pay claims made against it, unless that captive insurance group is a captive risk retention group." § 33-18-242(9).

Here, the parties do not dispute that Plaintiffs are third-party claimants, and that CorVel is not an insurer. In their response to CorVel's motion to dismiss, Plaintiffs assert that self-insured Sysco uses a wholly owned captive insurance company, which is not a captive risk retention group. (Doc. 34 at 15.)[10] CorVel does not address the captive insurance company argument. Because Sysco's utilization of a captive insurance company is a new fact raised in its response to CorVel's motion to dismiss, it is not considered here. *Gabaldon v. Cnty. of Maricopa*, 2023 WL 2648135, at *1 n.1 (D. Ariz. 2023); *see also Schneider v. Cal.*

---

[10] "Plaintiffs have recently discovered that Sysco's 2023 10k states that it covers vehicle liability through a wholly owned captive insurance subsidiary, which is not a[]" risk retention group. (Doc. 34 at 15) (citing Sysco, 2023 Annual Rep. (2023), https://investors.sysco.com/~/media/Files/S/Sysco-IR/documents/annual-reports/Sysco_2023-Annual-Report_Web.pdf).)

*Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.")).[11]  Setting aside whether Sysco is an insurer within the meaning of the UTPA, CorVel argues that Plaintiffs functionally asserted § 33-18-242 claims because this section provides the exclusive remedy to third parties seeking redress for damages arising out of the handling of an insurance claim against insurers or non-insurers.  CorVel also insists that the second sentence of § 33-18-242(4) expressly precludes bad faith claims against insurers and non-insurers alike in connection with the handling of an insurance claim.  Neither argument is persuasive.

### a.  Section 33-18-242(4): Exclusivity

In its first sentence, § 33-18-242(4) states, "[a] third-party claimant who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for fraud or pursuant to this section, *but not under any other theory or cause of action*."  (Emphasis added).  The other theories or causes of action at issue here are those provided by § 33-18-201 and the common law.

---

[11] Plaintiffs in their response to CorVel's motion to dismiss state that they "intend to amend the Complaint in the instant matter to add Sysco as a Defendant" because Sysco is not an insurer within the meaning of § 33-18-242.  (Doc. 34 at 15.)  To date, Plaintiffs have not done so.

Section 33-18-201 states that "[a] person may not, with such frequency as to indicate a general business practice, do" certain enumerated practices. The parties agree that prior to the 2023 amendment of § 33-18-242, the Montana Supreme Court recognized that a third-party claimant had a common-law right of action[12] against non-insurer entities or individuals who violated § 33-18-201. *See O'Fallon v. Farmers Ins. Exch.*, 859 P.2d 1008, 1014–15 (Mont. 1993). CorVel argues that post-amendment, this is no longer the case. According to CorVel, the Montana Supreme Court only recognized this right because § 33-18-242 did "not otherwise limit previously created common law causes of action," *id.* at 1015, but the amendment "eliminated the previously recognized third-party carveout" and "established § 33-18-242 as an exclusive remedy for third-party claimants," (Doc. 19 at 19). And this exclusive remedy is only permitted against insurers. In response, Plaintiffs argue that amended § 33-18-242(4) neither abrogates *O'Fallon* nor is the exclusive remedy for third-party claimants who suffered damages as a result of the handling of an insurance claim. Instead, third-party claimants in this context still maintain the cause of action provided by § 33-18-201, which can be utilized to bring claims against non-insurers. Because Plaintiffs' tort claims are

___

[12] As explained in a preceding note, in 2019, the Montana Supreme Court explained that claims under § 33-18-201 are not common-law claims, but claims made pursuant to "a private right of action implicitly conferred by" § 33-18-201. *Larson*, 434 P.3d at 255 n.13.

26

based on alleged conduct and injury that occurred after the 2023 amendment, if

§ 33-18-242(4) applies, Plaintiffs' tort claims would be precluded.  *See Dzintars v.*

*Fireman's Fund Ins. Co.*, 2024 WL 4347887, at *3 (D. Mont. Sept. 30, 2024).

Based on the plain language of the provision, the whole statutory text, and

relevant caselaw, Plaintiffs are correct.  As it relates to statutory language, § 33-18-

201 states that "no person" may engage in certain enumerated conduct.  A

"person" is defined "as an individual, insurer, company . . . or any other legal

entity."  *O'Fallon*,  859 P.2d at 1014 (quoting § 33-1-202(3)) (emphasis omitted).

A party has a private implied right of action under this section to bring claims

based on its violation.  *Larson v. State by and Through Stapleton*, 434 P.3d 241,

255 n.13 (Mont. 2019).  Section 33-18-242, on the other hand, provides an

"independent cause of action *against an insurer* for actual damages caused by the

insurer's violation."  § 33-18-242(1) (emphasis added).  Under the plain meaning

of these two sections, § 33-18-201 and § 33-18-242 provide two distinct causes of

action: the former against a "person," the latter against an "insurer."  This indicates

that § 33-18-242 is not the exclusive remedy available to Plaintiffs here.

Since the amendment in May of 2023, there is limited caselaw on the

question presented here.  The Montana Supreme Court has not addressed amended

§ 33-18-242, and the federal district court has only done so three times, but only in

the context of claim against *insurers*.  In 2024, Judge Christensen determined that

27

"§ 33-18-242 does not prohibit a third-party claimant from bringing an action for common law bad faith" against third-party insurers. *Cranska v. UMIA Ins., Inc.*, 709 F. Supp. 3d 1200, 1215 (D. Mont. 2024)[13] (quoting *Brewington v. Emps. Fire Ins. Co.*, 992 P.2d 237, 240 (Mont. 1999)) (internal quotation marks omitted). However, eight months later, Chief Judge Morris concluded that "Montana law did not bar third parties from bringing common law bad faith claims or other claims based on the handling of insurance claims until . . . 2023[,]" which means that amended § 33-18-242(4) "prohibits the assertion of common law bad faith and infliction of emotional distress claims against third-party insurers." *Dzintars*, 2024 WL 4347887, at *3. Subsequently, relying on *Dzintars*, Magistrate Judge Johnston found that the pre-amendment version of § 33-18-242 "does not preclude claims for negligent or intentional infliction of emotional" against third-party insurers. *Lawson v. Fed. Rural Elec. Ins. Exchange*, 2024 WL 4905159, at *2 (D. Mont. Nov. 1, 2024). Because none of these cases involve claims brought against *non-insurers*, they provide no specific guidance here.

---

[13] This decision was appealed to the Ninth Circuit on the issue of *Ridley* payments, *see Ridley v. Guar. Nat'l Ins. Co.*, 286 Mont. 325 (Mont. 1997), which are not at issue here. The Circuit affirmed. *Cranska v. UMIA Ins., Inc.*, 2025 WL 1098879 (9th Cir. Apr. 14, 2025).

Nevertheless, caselaw preceding the 2023 amendment provides some insight. The language in § 33-18-242(4) mirrors the language in § 33-18-242(3)[14] with the only difference being that the former refers to a third-party claimant's right of action and the latter refers to an insured's right of action. A look to pre-amendment caselaw construing § 33-18-242(3) is therefore helpful here.[15] Section 33-18-242(3) has long been interpreted by Montana courts to "limit[] an insured . . . to a cause of action for breach of the insurance contract, for fraud, or pursuant to" § 33-18-242. *Brewington*, 992 P.2d at 240.

However, in *O'Fallon*, which was decided thirty years before § 33-18-242 was amended, the Montana Supreme Court concluded that "individuals, as well as insurers, are prohibited from engaging in the unfair trade practices set forth in" § 33-18-201, and "when an individual breaches the obligations imposed by that statute, the claimant who is damaged by that breach has a [right of] action against that individual." 859 P.2d at 1015. Specifically, the Montana Supreme Court

---

[14] "An insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract, for fraud, or pursuant to this section, but not under any other theory or cause of action." Mont. Code Ann. § 33-18-242(3).

[15] As explained above, in 2019, the Montana Supreme Court explained that a § 33-18-201 claim is not a common-law claim, but "properly characterized as a private right of action implicitly conferred by" § 33-18-201 under which one can bring claims of its violation. *Larson*, 434 P.3d at 255 n.13. Accordingly, the caselaw preceding this decision refers to the cause of action for § 33-18-201 claims as a common-law cause of action.

concluded that the "authoriz[ation of] a direct cause of action against 'persons' who violate" § 33-18-201 "is not in conflict with" § 33-18-242, "which provides for a statutory cause of action against 'insurers,' but does not otherwise limit previously created . . . causes of action." *Id.* Indeed, the Montana Supreme Court expressly stated that "nothing . . . in the text of the newly created statute, suggested that [it] would limit the parties against whom the [§ 33-18-201] claim . . . could be brought[,]" and explained that "the statutory cause of action provide for in § 33-18-242 . . . appl[ies] *only to insurers*." *Id.* (emphasis added). This language appears to cabin the preclusive effect of § 33-18-242 for two reasons: it provides a cause of action for claims against insurers alone and it does not deprive claimants of their access to other causes of action. The Montana Supreme Court later categorized § 33-18-242 as an "explicit[] limit [on] the liability of insurers." *Watters v. Guaranty Nat. Ins. Co.*, 3 P.3d 626, 636 (Mont. 2000), *overruled on other grounds Shilhanek v. D-2 Trucking, Inc.*, 70 P.3d 721 (Mont. 2003).

In addressing the preclusive effect of § 33-18-242, the Montana Supreme Court has also created a category of claims against insurers referred to as "pure common law claims[,]" which were first mentioned in *Thomas v. Northwestern National Insurance Co.* and defined as claims not "originating from the actual handling of an insurance claim." 973 P.2d 804, 809 (Mont. 1998). Further explanation was given in *Mark Ibsen, Inc. v. Caring for Montanans, Inc.*, defining

30

these claims as those that "fell completely outside of the UTPA, and were not premised upon any violation of the Act."  371 P.3d 446, 454–55 (Mont. 2016) (explaining "purely common law causes of action . . . are not precluded" by § 33-18-242).  Thus, claimants may advance common-law causes of action against insurers, but only if those claims fall "completely outside the UTPA[,]" *Mark Ibsen*, 371 P.3d at 454.

Accordingly, § 33-18-242 as amended is not the exclusive remedy for a third-party claimant seeking redress against non-insurers because such claimants may still bring claims pursuant to § 33-18-201 or common law.

### b.  Section 242(4): Prohibition of Bad Faith Action

The second sentence of § 33-18-242(4) states that "[a] third-party claimant may not bring an action for bad faith in connection with the handling of an insurance claim."  CorVel argues that provision precludes bad faith claims against insurers and non-insurers alike in connection with the handling of an insurance claim. Plaintiffs argue that the addition of § 33-18-242(4) "is fairly read as eliminating common law bad faith suits only against insurers."  (Doc. 34 at 16.) The Montana Supreme Court has not addressed this issue, and pre-amendment caselaw provides only limited guidance.

Read in isolation, the second sentence appears to be a clear prohibition of a third-party claimant's ability to bring a bad faith claim in connection with the

31

handling of an insurance claim. However, read in the context of subsection (4) and in the context of the section overall, this sentence prohibits such claims against *insurers*. The preceding sentence of the subsection states "[a] third-party claimant who has suffered damages as a result of the handling of an insurance claim may bring an action *against the insurer* for fraud or pursuant to this section, but not under any other theory or cause of action." § 33-18-242(4) (emphasis added).

Cabining the common-law bad faith claim prohibition to claims against insurers is also supported by the caselaw. In *Watters*, the Montana Supreme Court contrasted the Montana statutory scheme governing liability of insurers with that of two other states, explaining that the Montana "[l]egislature provided *insurers* . . . with . . . protection from bad faith claims *under common law* or UTPA" and categorized this as an "explicit[] limit [on] the liability of insurers." 3 P.3d at 636 (emphasis added). As to claims against non-insurers, in *O'Fallon*, the Montana Supreme Court found that § 33-18-242, "which provides for a statutory cause of action against 'insurers,' . . . does not otherwise limit previously created common law causes of action." 859 P.2d at 1015. Further, "[w]hen the common law is not in conflict with a statute, the common law applies." *Brewington*, 992 P2.d at 241. Read together, these cases confirm that § 33-18-242 prohibits insured or third-party claimants from bringing common-law bad faith claims against insurers, but leave open the question of whether such prohibition extends to non-insurers. And,

32

because they are inconsistent with one another, the recent federal court decisions provide no further clarity. *Compare Cranska*, 709 F.Supp.3d at 1215 *with Dzintars*, 2024 WL 4347887, at *3.

Ultimately, the 2023 amendment did not dramatically change the status quo of Montana's statutory scheme. While third-party claimants are now subject to the same limitations as insureds under § 33-18-242, the relationship between claims under § 33-18-242 and claims under § 33-18-201 and the common law remains the same. Like an insured, a third-party claimant is precluded from bringing bad faith claims arising from claim handling against insurers. However, like insureds, they may still seek redress against non-insurers under § 33-18-201 or the common law.

### c. Conclusion and Application

Because Plaintiffs have not functionally asserted § 33-18-242 claims, they are not barred by the limitation language in that section. However, Plaintiffs' bad faith claim may proceed only as construed below.

Plaintiffs' common-law bad faith claim is asserted as a hybrid claim alleging violations of both § 33-18-201 and common-law based on the same conduct. Plaintiffs allege the following:

COUNT I
COMMON LAW BAD FAITH

34. Defendants had a common law duty of good faith to Coutos that exists independent of contract and independent of statute. The duty attaches to every person involved in adjusting insurance claims in

33

Montana. The duty required honesty and fact and the observance of reasonable commercial standards by Defendants in their performance of the insurance claim handling functions. By engaging in conduct described herein, Defendants breached their common law duty of good faith.

35. Defendants violated multiple standards set forth in § 33-18-201, Mont. Code Ann. including the duty to accurately represent facts relating to coverages (1), the duty to adopt and implement reasonable standards for the prompt investigation of claims (3), the duty to perform a reasonable investigation before denying claims (4), the duty to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear (6), compelling insureds to institute litigation to recover amounts due under the insurance policy (7), and attempting to settle a claim for less than the amount to which a reasonable person would have believed the person was entitled (8). Violation of these standards in Montana by a noninsurer [sic] in connection with claim handling constitutes bad faith.

(Doc. 1 at ¶¶ 34, 35.)

Given the complexity of the caselaw in this area as discussed above, Plaintiffs' claim is construed as two separate claims: a common-law bad faith claim and a § 33-18-201 claim. The common-law bad faith claim fails, not because it is precluded by § 33-18-242, but because it is "duplicative of the UTPA" claim, and fails as a matter of law. *Brodowy v. Progressive Direct Ins. Co.*, 2023 WL 5670003, at * (D. Mont. Sept. 1, 2023) (explaining a common-law bad faith claim that does "not identif[y] any applicable common law duty outside the obligations imposed under the UTPA" and relies on "the same facts . . . . fail[s] as a matter of law). Indeed, because this claim is "not independently cognizable" it is "necessarily subsumed" into the statutory claim. *Folson v. Mont. Pub. Emps.*

*Ass'n*, 400 P.3d 706, 715–17 (Mont. 2017).  Count I may therefore proceed as a

§ 33-18-201 claim.  (*See* Doc. 1 at ¶ 35.)

## IV.    Failure to State Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  To survive a Rule 12(b)(6) challenge, a plaintiff must

allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Dismissal is appropriate "where there is no cognizable legal theory or an absence

of sufficient facts alleged to support a cognizable legal theory."  *L.A. Lakers, Inc.*

*v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks

omitted).

CorVel seeks dismissal of Plaintiffs' consumer protection claim (Count II),

agent liability claim (Count III), and joint tortious enterprise claim (Count VI) for

failure to state a claim, but does not argue dismissal on the merits as to the other

claims aside from the § 33-18-242 preclusion argument above.  Ultimately, CorVel

is correct as to the consumer protection and agency claims.

### a. Montana Consumer Protection Act (Count II)

Plaintiffs correctly concede that they do not meet the definition of

"consumer" under the Montana Consumer Protection Act, *see* Mont. Code Ann.

§ 30-14-102, and therefore do not oppose dismissal of this claim. (Doc. 34 at 30.)

### b. Joint Tortious Enterprise (Count VI)

In Montana, "[a] joint enterprise is a relationship [that] arises from an

agreement between two or more persons to undertake some common objective for

the benefit of all[,]" *Kaplan v. Hauf*, 492 P.2d 213, 217 (Mont. 1971), which

imputes the tort of a member of the enterprise to the other members, *see Sumner v.*

*Amacher*, 437 P.2d 630, 634–35 (Mont. 1968); *Storrusten v. Harrison*, 549 P.2d

464, 468 (Mont. 1976) (citing Prosser on the Law of Torts, at 475 (4th ed. 1984)

(explaining "the act of any one within the scope of the enterprise is to be charged

vicariously against the rest")). The elements of a joint enterprise are "(1) an

agreement, express or implied among the members of the group; (2) a common

purpose to be carried out by the group; (3) a community of pecuniary interest in

that purpose among the members; and (4) an equal right to a voice in the direction

of the enterprise, which gives an equal right of control." *Sumner*, 437 P.2d at 635

(citing Restatement (Second) of Torts § 491 cmt. c); *Rae v. Cameron*, 114 P.2d

1060, 1064–65 (Mont. 1941). Determination of whether a joint enterprise existed

requires consideration of the "totality of the facts." *Sumner*, 437 P.2d at 635; *see*

*Rae*, 114 P.2d at 1064 (explaining that courts "determine . . . whether the given or conceded facts in the particular case constitute[ such a] relationship").

Joint tortious enterprise is necessarily predicated on an underlying tort. *See Sumner*, 437 P.2d at 634–35; *Storrusten*, 549 P.2d at 468. CorVel argues that because this claim is "premised entirely on" Plaintiffs' "predicate" common-law claims that are "precluded by § 33-18-242(4)[,]" it fails as a matter of law. (Doc. 19 at 28.) However, as explained above, Plaintiffs' tort claims may proceed at this stage and supply the requisite underlying tort.

Aside from asserting preclusion, CorVel merely argues that Plaintiffs "fail to allege any facts to support this claim" and "incorporates" Mitchell's argument as to this claim.[16] (Doc. 19 at 28–30.) However, the Complaint alleges that "Mitchell deliberately incorporated into its [Software] factors that artificially depress the valuation of totaled vehicles and other damaged vehicles; CorVel and Alacrity knew about these manipulated factors and/or consciously disregarded the high probability of harm to plaintiffs." (Doc. 1 at ¶ 32.) Fact questions and the specific acts of each Defendant can only be evaluated on the proof, not the pleadings. *Cf. Sumner*, 437 P.2d at 635; *Rae*, 114 P.2d at 1064. Assuming Plaintiffs' allegations

---

[16] Mitchell's argument erroneously relies on *Churchill v. Trinity Universal Ins. Co.* to assert that joint tortious enterprise requires "proof [of] substantial assistance." (Doc. 17 at (citing 2010 WL 11468358, at *7–8 (D. Mont. Mar. 2, 2010).) Proof of substantial assistance is required to prevail on a claim of "civil aiding and abetting" not joint tortious enterprise. *Id.*

as true, which is required at this stage of the proceedings, *see Ariix, LLC*, 985 F.3d

at 1114, this claim may proceed.

### c. Agent Liability (Count III)

Under Montana law,

> [a] person who assumes to act as an agent is responsible to third persons
> as a principal for acts in the course of the agency in any of the following
> cases and in no other:
>> (1) when, with the agent's consent, credit is given to the agent
>> personally in a transaction;
>> (2) when the agent enters into a written contract in the name of
>> the principal without believing in good faith that the agent has
>> authority to do so; or
>> (3) when the agent's acts are wrongful in their nature.

Mont. Code Ann. § 28-10-702. This section codifies a theory of liability,

specifically when an agent can be held individually liable for acts that would

typically be imputed to the principal. Such a theory of liability is not an actionable

on its own. Indeed, in cases that rely on § 28-10-702, the claims are typically

alleged as causes of action for contract or tort. *E.g.*, *Romo v. Shirley* , 522 P.3d

401, 406 (Mont. 2022) (the plaintiffs "sued . . . on a variety of contract and tort

theories."); *Estate of Brager v. Weinberger*, 286 P.3d 688, at *1 (Mont. May 4,

2021) ("The complaint alleged [defendant] was negligent[, and] . . . violated the

Montana Consumer Protection Act."); *Williams v. DeVinney*, 856 P.2d 546, 548

(Mont. 1993) (the plaintiffs alleged "intentional or negligent misrepresentation").

Here, Plaintiffs plead that "CorVel and Alacrity, as agents of Sysco, committed wrongful acts which caused damage to plaintiffs and, pursuant to § 28-10-702(3), CorVel and Alacrity are liable for all such damages." (Doc. 1 at 15.) CorVel correctly argues that Plaintiffs' claim for agent liability is not a standalone claim for relief. Accordingly, the agent liability claim may not proceed as a standalone claim, but, as a theory of liability, it may be incorporated into Plaintiffs' § 33-18-201 claim and common-law tort claims.

## V.    Class Action

Plaintiffs seek class certification and an order appointing Couto LLC and its counsel to represent the class. (Doc. 1 at 30.) CorVel seeks dismissal of all "class counts" pursuant to Rule 12(b)(6). Specifically, CorVel argues that because Couto LLC has "no individually cognizable claims for relief" it "does not qualify as a class representative." (Doc. 36 at 4.) Plaintiffs have yet to file a separate motion for class certification.

A Rule 12(b)(6) motion is not the proper vehicle to address the sufficiency of class allegations under Rule 23 of the Federal Rules of Civil Procedure. *Gillibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir. 1969). Indeed, "a motion for class certification is a more appropriate vehicle[,]" to determine such sufficiency because of the "rigorous analysis required of class certification[,]" which necessitates "development of the record." *See Taylor v. Populus Group,*

39

*LLC*, 2020 WL 6131727, at *3 (S.D. Ca. Oct. 19, 2020).  Here, Plaintiffs have yet

to move to certify their class and discovery has not commenced.  CorVel's motion

is therefore denied as premature.

CONCLUSION

Based on the foregoing reasons, IT IS ORDERED that Mitchell and

CorVel's motions to dismiss, (Docs. 16, 18), are GRANTED IN PART and

DENIED IN PART.  Plaintiff Heidi Couto is DISMISSED for lack of standing and

Defendant Mitchell is DISMISSED for lack of personal jurisdiction.  The

following individual claims are DISMISSED: common-law bad faith claim,[17]

consumer protection claim, and agent liability claim.  Plaintiffs' remaining claims

may proceed on the merits.

IT IS FURTHER ORDERED that the caption is amended to reflect the

correct name of Defendant CorVel Enterprise Comp., Inc.

DATED this 30ᵗʰ day of July, 2025.

_____
Donald W. Molloy, District Judge
United States District Court

_____

[17] As explained herein, Count I may proceed as a § 33-18-201 claim.